UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. |
| | ) |
| CORETTA "CORY" ELLIOTT, | ) |
| | ) |
| Defendant. | ) |

**GUILTY PLEA AGREEMENT**

Come now the parties and hereby agree, as follows:

**1. PARTIES:**

The parties are the defendant, Coretta "Cory" Elliott, represented by defense counsel Talmage Newton, IV, and the United States of America (hereinafter "United States" or "Government"), represented by Assistant United States Attorney Hal Goldsmith and the Office of the United States Attorney for the Eastern District of Missouri. This agreement does not, and is not intended to, bind any governmental office or agency other than the United States Attorney for the Eastern District of Missouri. The Court is neither a party to nor bound by this agreement.

**2. GUILTY PLEA:**

Pursuant to Rule 11(c)(1)(A), Federal Rules of Criminal Procedure, in exchange for the defendant's voluntary plea of guilty to Counts 1 and 2 of the Information, the United States agrees that no further federal prosecution will be brought in this District relative to the defendant's fraudulent conduct in obtaining funds under the 2020 CARES Act, and in assisting others in

1

obtaining funds under the 2020 CARES Act, as set forth in the Information and of which the Government is aware at this time.

In addition, the parties agree that the U.S. Sentencing Guidelines Total Offense Level analysis agreed to by the parties herein is the result of negotiation and led, in part, to the guilty plea. The parties further agree that either party may request a sentence above or below the U.S. Sentencing Guidelines range (combination of Total Offense Level and Criminal History Category) ultimately determined by the Court pursuant to any chapter of the Guidelines and Title 18, United States Code, Section 3553(a). The parties further agree that notice of any such request will be given no later than ten days prior to sentencing and that said notice shall specify the legal and factual bases for the request.

## 3. ELEMENTS:

As to Counts 1 and 2, Wire Fraud, the defendant admits to knowingly violating Title 18, United States Code, Section 1343, and admits there is a factual basis for the plea and further fully understands that the elements of the crime are:

1. Defendant voluntarily and intentionally devised or participated in a scheme to defraud and to obtain money by means of materially false or fraudulent pretenses or representations from the United States, through the Small Business Administration pandemic relief program, as detailed in the Information;

2. The pretenses or representations were material, that is, they would reasonably influence a person to part with money;

3. Defendant did so with the intent to defraud; and,

4. In advancing, or furthering, or carrying out her scheme to defraud and to obtain money by means of false or fraudulent pretenses or representations, Defendant used or caused to be used an interstate wire communication in furtherance of, or in an attempt to carry out, some essential step in the scheme.

## 4. FACTS:

The parties agree that the facts in this case are as follows and that the government would prove these facts beyond a reasonable doubt if the case were to go to trial. These facts may be considered as relevant conduct pursuant to Section 1B1.3:

CMT, LLC was a contractor and building construction service originated during 2012 and owned and operated by Defendant, **CORETTA "CORY" ELLIOTT** in the St. Louis, Missouri area. CMT, LLC provided commercial construction, demolition, roofing, landscaping and remediation services. CMT, LLC also did business as CMT Roofing, LLC.

The COVID-19 pandemic had a significant effect on the nation and its economy. Stay-at-home orders, social distancing requirements, and reduced consumer demand early in the pandemic caused both temporary and permanent business closures, particularly among small businesses. To help support small businesses, in March 2020, Congress passed the CARES Act that, among other things, provided funds for a new Small Business Administration (hereinafter referred to as "SBA") pandemic relief program: the Paycheck Protection Program (hereinafter referred to as "PPP"). The PPP provided forgivable loans to small businesses for job retention and certain other expenses. The PPP permitted participating third-party lenders to approve and disburse SBA-backed PPP loans to cover payroll, fixed debts, utilities, rent/mortgage, accounts payable and other bills incurred by qualifying businesses during, and resulting from, the COVID-19 pandemic. PPP loans were fully guaranteed by the SBA.

To obtain a PPP loan, a qualifying business had to submit a PPP loan application, which was signed by an authorized representative of the business. The PPP loan application required the business to acknowledge the program rules and make certain affirmative certifications to be

3

eligible to obtain the PPP loan, including that the business was in operation and either had employees for whom it paid salaries and payroll taxes or paid independent contractors. A business applying for a PPP loan was required to provide documentation showing its payroll expenses, such as filed federal income tax documents.

The proceeds of a PPP loan could be used for certain specified items, such as payroll costs, costs related to the continuation of group health care benefits, or mortgage interest payments. The proceeds of a PPP loan were not permitted to be used by the borrowers to purchase consumer goods, automobiles, personal residences, clothing, jewelry, to pay the borrower's personal federal income taxes, or to fund the borrower's ordinary day-to-day living expenses unrelated to the specified authorized expenses.

Under the applicable PPP rules and guidance, recipients of PPP loans could apply to have the interest and principal on the PPP loan fully forgiven, meaning that the borrower would owe nothing and would have no obligation to repay the PPP loan. To obtain full forgiveness of the PPP loan, borrowers had to attest that they had "not reduced the number of employees or the average paid hours of [their] employees" during the loan period, that the loan proceeds had been spent on payroll costs and other permitted expenses and that at least 60% of the loan proceeds had been spent on payroll costs.

Borrowers who qualified for and received a "First Draw" PPP loan were permitted to apply for a "Second Draw" PPP loan, provided that the borrower had (a) previously received a First Draw PPP loan and had used the full amount only for authorized uses; (b) had no more than 300 employees; and (c) could demonstrate at least a 25% reduction in gross receipts between comparable quarters in 2019 and 2020. Like the First Draw PPP loans, Second Draw PPP loans

could only be used for certain permitted expenses, such as to fund payroll costs and employee benefits, such as health insurance, to pay for mortgage interest, rent, utilities or worker protection costs related to COVID-19.

Regions Bank was a third-party participating lender in the PPP.

Defendant **CORETTA "CORY" ELLIOTT**, through her company CMT, LLC, doing business as CMT Roofing, LLC, applied for and obtained a First Draw PPP loan, as well as a Second Draw PPP loan, both of which were ultimately forgiven by the SBA.

On or about April 1, 2020, **ELLIOTT**, on behalf of CMT Roofing, LLC, submitted a false online PPP Application Form to the SBA seeking a First Draw PPP loan in the amount of $875,000.00 for pandemic-related economic assistance. As part of that application, **ELLIOTT** certified the loan funds "…will be used only for business related purposes", and "The funds will be used to retain workers and maintain payroll or make mortgage payments, lease payments, and utility payments…." **ELLIOTT** also certified that "…the information provided in this application…is true and accurate." **ELLIOTT** acknowledged her understanding that "…if the funds are used for unauthorized purposes, the federal government may pursue criminal fraud charges." **ELLIOTT** falsely inflated the average monthly payroll amount for CMT Roofing, LLC in order to obtain a significantly larger loan amount than CMT Roofing, LLC might otherwise have been eligible for.

On or about April 22, 2020, in reliance on the false statements contained within the application, SBA approved CMT Roofing, LLC's PPP First Draw application. SBA, through its PPP participating lender Regions Bank, electronically transmitted by wire from Regions Bank into the CMT Roofing, LLC bank account ending in 8384 at Regions Bank (hereinafter referred to as

"CMT Roofing, LLC Bank Account"), the PPP First Draw proceeds of $875,000.00. Following receipt of the PPP First Draw loan proceeds, **ELLIOTT** used the loan proceeds for impermissible purposes, unrelated to payroll and other legitimate authorized business expenses of CMT Roofing, LLC. The impermissible purposes included, but were not limited to, disbursing approximately $408,871.48 in payments to unions.

On or about January 20, 2021, **ELLIOTT**, on behalf of CMT Roofing, LLC, submitted a false PPP Loan Forgiveness Application Form to SBA requesting that the PPP First Draw loan amount of $875,000.00 be forgiven. The application falsely claimed that **ELLIOTT** and CMT Roofing, LLC had used the loan proceeds "…to pay costs that are eligible for forgiveness (payroll costs to retain employees; business mortgage interest payments; business rent or lease payments; or business utility payments). In reliance on the false statements contained within the application, on or about February 1, 2021, SBA granted **ELLIOTT's** application and forgave $875,000.00 in principal and $6,832.19 in interest, and electronically transmitted by wire those funds from SBA through the FMS system in Sterling, VA to Regions Bank in full satisfaction of the PPP First Draw loan to CMT Roofing, LLC.

On or about January 30, 2021, Defendant **ELLIOTT**, on behalf of CMT Roofing, LLC, submitted a false online PPP Application Form to the SBA seeking a Second Draw PPP loan in the amount of $833,333.00 for pandemic-related economic assistance. As part of that application, **ELLIOTT** certified the loan funds "…will be used only for business related purposes", and "The funds will be used to retain workers and maintain payroll or make mortgage payments, lease payments, and utility payments…." **ELLIOTT** also certified that "…the information provided in this application…is true and accurate." **ELLIOTT** acknowledged her understanding that "…if

6

the funds are used for unauthorized purposes, the federal government may pursue criminal fraud charges." **ELLIOTT** falsely inflated the average monthly payroll amount for CMT Roofing, LLC in order to obtain a significantly larger loan amount than CMT Roofing, LLC might otherwise have been eligible for.

On or about February 1, 2021, SBA, in reliance on the false statements contained within the application, approved CMT Roofing, LLC's PPP Second Draw application. SBA, through its PPP participating lender Regions Bank, electronically transmitted by wire from Regions Bank into the CMT Roofing, LLC Bank Account, the PPP Second Draw proceeds of $833,333.00. Following receipt of the PPP Second Draw loan proceeds, **ELLIOTT** used the loan proceeds for impermissible personal use and purposes, unrelated to payroll and other legitimate authorized business expenses of CMT Roofing, LLC. The impermissible personal use and purposes included, but were not limited to, disbursing approximately $150,583.98 in payments to unions and $2,500 in payments to another company controlled by **ELLIOTT**. Additionally, **ELLIOTT** impermissibly diverted $200,000.00 of the loan proceeds to her personal Northwestern Mutual investment account held at BNY Mellon/Pershing Brokerage. **ELLIOTT** later converted this brokerage account to a personal trust in her name.

On or about August 12, 2021, **ELLIOTT**, on behalf of CMT Roofing, LLC, submitted a false PPP Loan Forgiveness Application Form to SBA requesting that the PPP Second Draw loan amount of $833,333.00 be forgiven. The application falsely claimed that **ELLIOTT** and CMT Roofing, LLC had used the loan proceeds "…to pay costs that are eligible for forgiveness (payroll costs to retain employees; business mortgage interest payments; business rent or lease payments; or business utility payments). In reliance on the false statements contained within the application,

on or about August 7, 2021, SBA granted **ELLIOTT's** application and forgave $833,333.00 in principal and $4,497.72 in interest, and electronically transmitted by wire those funds from SBA through the FMS system in Sterling, VA to Regions Bank in full satisfaction of the PPP Second Draw loan to CMT Roofing, LLC.

On or about February 1, 2021, within the Eastern District of Missouri and elsewhere, for the purpose of executing her scheme to defraud and to obtain money and property by means of materially false and fraudulent pretenses, and representations, **ELLIOTT** knowingly caused the SBA to transmit payment information through the FMS system in Sterling, Virginia to the United States Treasury Department which electronically transmitted $881,832.19 in funds to Regions Bank in full forgiveness of the CMT Roofing, LLC PPP First Draw loan.

On or about August 17, 2021, within the Eastern District of Missouri and elsewhere, for the purpose of executing her scheme to defraud and to obtain money and property by means of materially false and fraudulent pretenses, and representations, **ELLIOTT** knowingly caused the SBA to transmit payment information through the FMS system in Sterling, Virginia to the United States Treasury Department which electronically transmitted $833,333.00 in funds to CMT Roofing, LLC's Bank Account representing the proceeds of the PPP Second Draw Loan.

## 5. STATUTORY PENALTIES:

The defendant fully understands that the maximum possible penalty provided by law for each of the crimes to which the defendant is pleading guilty is imprisonment of not more than Thirty (30) years, a fine of not more than $1,000,000, or both such imprisonment and fine. The Court may also impose a period of supervised release of not more than Three (3) years.

6. **U.S. SENTENCING GUIDELINES: 2024 MANUAL:**

The defendant understands that these offenses are affected by the U.S. Sentencing Guidelines and the actual sentencing range is determined by both the Total Offense Level and the Criminal History Category. The parties agree that the following are the applicable U.S. Sentencing Guidelines Total Offense Level provisions.

    a.    **Chapter 2 Offense Conduct:**

    (1) **Base Offense Level:** The parties agree that the base offense level is Seven (7), as found in Section 2B1.1(a)(1).

    (2) **Specific Offense Characteristics:** The parties agree that the following Specific Offense Characteristics apply:

        i.    Sixteen (16) levels are added pursuant to Section 2B1.1(b)(1)(I), as the loss was more than $1,500,000, but less than $3,500,000.

        ii.    Two (2) levels are added pursuant to Section 2B1.1(b)(12) as the fraudulent offense conduct was connected with major disaster or emergency benefits.

    b.    **Chapter 3 Adjustments:**

    (1)    **Acceptance of Responsibility:** The parties agree that Three (3) levels should be deducted pursuant to Section 3E1.1(a) and (b), because the defendant has clearly demonstrated acceptance of responsibility and timely notified the government of the defendant's intention to plead guilty. The parties agree that the defendant's eligibility for this deduction is based upon information presently known. If subsequent to the taking of the guilty plea the government receives new evidence of statements or conduct by the defendant which it believes are inconsistent with defendant's eligibility for this deduction, the government may present said

evidence to the court, and argue that the defendant should not receive all or part of the deduction pursuant to Section 3E1.1, without violating the plea agreement.

**c.** **Other Adjustments:** The parties agree that the following additional adjustments apply: A two (2) level adjustment pursuant to U.S.S.G. Section 4C1.1(a).

**d.** **Estimated Total Offense Level:** The parties estimate that the Total Offense Level is Twenty (20).

**e.** **Criminal History:** The determination of the defendant's Criminal History Category shall be left to the Court. Either party may challenge, before and at sentencing, the finding of the Presentence Report as to the defendant's criminal history and the applicable category. The defendant's criminal history is known to the defendant and is substantially available in the Pretrial Services Report.

**f.** **Effect of Parties' U.S. Sentencing Guidelines Analysis:** The parties agree that the Court is not bound by the Guidelines analysis agreed to herein. The parties may not have foreseen all applicable Guidelines. The Court may, in its discretion, apply or not apply any Guideline despite the agreement herein and the parties shall not be permitted to withdraw from the plea agreement.

## 7. WAIVER OF APPEAL AND POST-CONVICTION RIGHTS:

**a. Appeal:** The defendant has been fully apprised by defense counsel of the defendant's rights concerning appeal and fully understands the right to appeal the sentence under Title 18, United States Code, Section 3742.

**(1)** **Non-Sentencing Issues:** The parties waive all rights to appeal all non-jurisdictional, non-sentencing issues, including, but not limited to, any issues relating to pretrial

10

motions, discovery, the guilty plea, the constitutionality of the statute(s) to which defendant is pleading guilty and whether defendant's conduct falls within the scope of the statute(s).

**(2) Sentencing Issues:** In the event the Court accepts the plea, accepts the U.S. Sentencing Guidelines Total Offense Level agreed to herein, and after determining a Sentencing Guidelines range, sentences the defendant within or below that range, then, as part of this agreement, the defendant hereby waives all rights to appeal all sentencing issues other than Criminal History, but only if it affects the Base Offense Level or Criminal History Category. Similarly, the Government hereby waives all rights to appeal all sentencing issues other than Criminal History, provided the Court accepts the plea, the agreed Total Offense Level and sentences the defendant within or above that range.

**b. Habeas Corpus:** The defendant agrees to waive all rights to contest the conviction or sentence in any post-conviction proceeding, including one pursuant to Title 28, United States Code, Section 2255, except for claims of prosecutorial misconduct or ineffective assistance of counsel.

**c. Right to Records:** The defendant waives all rights, whether asserted directly or by a representative, to request from any department or agency of the United States any records pertaining to the investigation or prosecution of this case, including any records that may be sought under the Freedom of Information Act, Title 5, United States Code, Section 522, or the Privacy Act, Title 5, United States Code, Section 552(a).

**8. OTHER:**

**a. Disclosures Required by the United States Probation Office:** The defendant agrees to truthfully complete and sign forms as required by the United States Probation Office prior to

11

sentencing and consents to the release of these forms and any supporting documentation by the United States Probation Office to the government.

  **b. Civil or Administrative Actions not Barred; Effect on Other Governmental Agencies**: Nothing contained herein limits the rights and authority of the United States to take any civil, tax, immigration/deportation or administrative action against the defendant.

  **c. Supervised Release**: Pursuant to any supervised release term, the Court will impose standard conditions upon the defendant and may impose special conditions related to the crime defendant committed. These conditions will be restrictions on the defendant to which the defendant will be required to adhere. Violation of the conditions of supervised release resulting in revocation may require the defendant to serve a term of imprisonment equal to the length of the term of supervised release, but not greater than the term set forth in Title 18, United States Code, Section 3583(e)(3), without credit for the time served after release. The defendant understands that parole has been abolished

  **d. Mandatory Special Assessment**: Pursuant to Title 18, United States Code, Section 3013, the Court is required to impose a mandatory special assessment of $100 per count for a total of $200, which the defendant agrees to pay at the time of sentencing. Money paid by the defendant toward any restitution or fine imposed by the Court shall be first used to pay any unpaid mandatory special assessment.

  **e. Possibility of Detention**: The defendant may be subject to immediate detention pursuant to the provisions of Title 18, United States Code, Section 3143.

  **f. Fines, Restitution and Costs of Incarceration and Supervision**: The Court may impose a fine, restitution (in addition to any penalty authorized by law), costs of incarceration and

costs of supervision. The defendant agrees that any fine or restitution imposed by the Court will be due and payable immediately. Pursuant to Title 18, United States Code, Section 3663A, an order of restitution is mandatory for all crimes listed in Section 3663A(c). Regardless of the Count of conviction, the amount of mandatory restitution imposed shall include all amounts allowed by Section 3663A(b) and the amount of loss agreed to by the parties, including all relevant conduct loss. The defendant agrees to provide full restitution to all victims of all charges in the indictment.

**g. Forfeiture:** The defendant agrees the stipulated facts above are sufficient to support forfeiture of certain assets pursuant to the applicable forfeiture authorities. The defendant agrees the Court may enter a consent preliminary order of forfeiture any time before sentencing, and such Order will become final as to the defendant when it is issued and will be part of the sentence. The defendant agrees not to object to any administrative, civil or criminal forfeiture brought against any assets subject to forfeiture. The defendant will execute any documents and take all steps needed to transfer title or ownership of said assets to the government and/or to rebut the claims of nominees and/or alleged third party owners. The defendant knowingly and intelligently waives all constitutional and statutory challenges to any forfeiture carried out in accordance with this plea agreement, including but not limited to that defendant was not given adequate notice of forfeiture in the charging instrument. The defendant knowingly and voluntarily waives any right, title, and interest in all items seized by law enforcement officials during the course of their investigation, whether or not they are subject to forfeiture, and agrees not to contest the vesting of title of such items in the United States. The defendant agrees that said items may be disposed of by law enforcement officials in any manner.

**9. ACKNOWLEDGMENT AND WAIVER OF THE DEFENDANT'S RIGHTS:**

13

In pleading guilty, the defendant acknowledges, fully understands and hereby waives her rights, including but not limited to: the right to plead not guilty to the charges; the right to be tried by a jury in a public and speedy trial; the right to file pretrial motions, including motions to suppress or exclude evidence; the right at such trial to a presumption of innocence; the right to require the government to prove the elements of the offenses against the defendant beyond a reasonable doubt; the right not to testify; the right not to present any evidence; the right to be protected from compelled self-incrimination; the right at trial to confront and cross-examine adverse witnesses; the right to testify and present evidence and the right to compel the attendance of witnesses. The defendant further understands that by this guilty plea, the defendant expressly waives all the rights set forth in this paragraph.

The defendant fully understands that the defendant has the right to be represented by counsel, and if necessary, to have the Court appoint counsel at trial and at every other stage of the proceeding. The defendant's counsel has explained these rights and the consequences of the waiver of these rights. The defendant fully understands that, as a result of the guilty plea, no trial will, in fact, occur and that the only action remaining to be taken in this case is the imposition of the sentence.

The defendant is fully satisfied with the representation received from defense counsel. The defendant has reviewed the government's evidence and discussed the government's case and all possible defenses and defense witnesses with defense counsel. Defense counsel has completely and satisfactorily explored all areas which the defendant has requested relative to the government's case and any defenses.

The guilty plea could impact defendant's immigration status or result in deportation. In particular, if any crime to which defendant is pleading guilty is an "aggravated felony" as defined by Title 8, United States Code, Section 1101(a)(43), removal or deportation is presumed mandatory. Defense counsel has advised the defendant of the possible immigration consequences, including deportation, resulting from the plea.

### 10. **VOLUNTARY NATURE OF THE GUILTY PLEA AND PLEA AGREEMENT:**

This document constitutes the entire agreement between the defendant and the government, and no other promises or inducements have been made, directly or indirectly, by any agent of the government, including any Department of Justice attorney, concerning any plea to be entered in this case. In addition, the defendant states that no person has, directly or indirectly, threatened or coerced the defendant to do or refrain from doing anything in connection with any aspect of this case, including entering a plea of guilty.

The defendant acknowledges having voluntarily entered into both the plea agreement and the guilty plea. The defendant further acknowledges that this guilty plea is made of the defendant's own free will and that the defendant is, in fact, guilty.

### 11. **CONSEQUENCES OF POST-PLEA MISCONDUCT:**

After pleading guilty and before sentencing, if defendant commits any crime, other than minor traffic offenses, violates any condition of release that results in revocation, violates any term of this guilty plea agreement, intentionally provides misleading, incomplete or untruthful information to the U.S. Probation Office or fails to appear for sentencing, the United States, at its option, may be released from its obligations under this agreement. The Government may also, in its discretion, proceed with this agreement and may advocate for any sentencing position supported

by the facts, including but not limited to obstruction of justice and denial of acceptance of responsibility.

## 12. NO RIGHT TO WITHDRAW GUILTY PLEA:

Pursuant to Rule 11(c) and (d), Federal Rules of Criminal Procedure, the defendant understands that there will be no right to withdraw the plea entered under this agreement, except where the Court rejects those portions of the plea agreement which deal with charges the government agrees to dismiss or not to bring.

November 4, 2025
Date

HAL GOLDSMITH
Assistant United States Attorney

11.4.2025
Date

CORETTA "CORY" ELLIOTT
Defendant

11-4-2025
Date

TALMAGE NEWTON IV
Attorney for Defendant

16